# DANIEL

*v.*

# THE COLUMBIA HEIGHTS LAND COMPANY.

REAL ESTATE BROKERS; AGENCY; COMMISSIONS.

1. A real estate broker who, having an agreement with a property owner that the latter will protect him against any other agent dealing directly with the owner so as to cut him out of his commission, consents to an arrangement by which the property is placed in the hands of another broker also, the commissions to be paid to the one making a sale, thereby incurs the risk of competition in the sale of the property and the chance of loss of commission even after the trouble and expense of advertising has been incurred.
2. Where real estate is placed for sale in the hands of two independent brokers under an arrangement with the owner, assented to by them both, that the commission shall be paid to the one selling the property, it is the duty of the owner to pay the commission to the one actually producing a purchaser and consummating a sale.
3. And when a purchaser is produced and the sale consummated by one broker and the commission paid him by the owner, the fact that the other broker had, by advertising, found the purchaser, and, by interviews, induced him to make the purchase, will not render the owner liable to him also.
4. An owner of property placing it in the hands of more than one broker under an agreement to pay commission to the one selling, is not required, upon a sale consummated in fact by one

of them, to investigate and decide between the claims of the several brokers, but may, in accordance with the agreement, pay the commission to the one actually consummating a sale without subjecting himself to a double liability.

No. 573.  Submitted November 18, 1896.  Decided December 1, 1896.

HEARING on an appeal by plaintiffs from a judgment on a verdict directed by the court in an action to recover commissions for the sale of real estate.  *Affirmed.*

The COURT in its opinion stated the case as follows:

The appellants, Thomas C. Daniel and Thomas Armat, trading as Daniel & Armat, who were plaintiffs below, brought this action to recover certain commissions on a sale of land.   Upon the close of the evidence the court instructed the jury to return a verdict for the defendant, the Columbia Heights Land Company.

There is no conflict in the evidence on the material points of the case, and the question for determination is the application of the law thereto.

Defendant owned lots 10 and 11 in block 33 of Columbia Heights subdivision, and the same had been for sale for several years.   Plaintiffs were agents to sell, and fearing that others might intervene in the matter and deprive them of their commission, procured from Sol Haas, the president of the defendant company, a promise that it would protect the plaintiffs " against any agent going around and buying the lots or dealing directly with him, the president, by which plaintiffs might be cut out of their commissions."

Plaintiffs then advertised the property, and procured from the owner of an adjoining lot, No. 12, authority to sell it also, at $1.15 per foot instead of the former price of $1.25, so that they might offer it with defendant's lots 10 and 11.

Plaintiffs advertised property in Columbia Heights at $1.36 per foot, and between October and December, 1894, Barr & Sanner called to know what lots were being offered at that price.   They were told of the lots and of the arrange-

ment concerning lot 12, which brought the whole down to an average of $1.36 per foot.

On January 17, 1895, plaintiffs learned from the record of a deed that day filed that the defendant had conveyed lots 10 and 11 to said Barr & Sanner. They telegraphed Haas, who was then away from the city, informing him that the sale had been made through their efforts, and that they would claim a commission. The purchase price had then been paid, and the commission paid to Myron M. Parker as agent of sale.

The lots had been for sale since 1885, and said Parker had been agent therefor. His sign was on the property during the time. In October, 1894, Haas told plaintiffs that Parker felt that he had been treated unfairly by the defendant's arrangement aforesaid, giving them authority to sell. He further told them that Parker had been paying taxes, looking after the water main and other assessments, and he thought it fair to give an agency to both parties, and whichever sold the property would be entitled to the commission. He read to them from a letter that he had prepared to said Parker, under date of October 27, 1894, the following extract:

" Referring to our conversation on Wednesday, I have concluded that the fairest thing to do and at the same time best serve the interests of the company I represent is to put our Columbia Heights property in the hands of both yourself and Messrs. Daniel & Armat, giving you both exactly the same prices, the commissions going to whoever sells the property."

Plaintiffs assented to the proposition, and the letter was sent to Parker. Having been informed that the sale had been made by Parker, a commission was paid him upon the execution of the deed and receipt of the money. Defendant had at the time no knowledge that plaintiffs had anything to do with the sale, or claimed a commission.

Lester A. Barr, a member of the partnership of Barr & Sanner, purchasers, was called by the plaintiffs. He said

that he and his partner owned and had built upon the adjoining lots 8 and 9 some two years before the purchase. That they wanted to buy 10 and 11 to continue their row of buildings, but that lot 12, by reason of an alley adjoining it, was " the key to the rear of lots 10 and 11," and they had made several efforts to buy it. That he knew that Parker was an agent for the sale of lots 10 and 11, because his sign was on them as was also that of one Liepold. That he had seen the advertisement of the plaintiffs offering the property at $1.36, and having never had the lots offered to them as cheap before, called in to see about it and to propose an exchange. That he made an offer of exchange of property for the whole, which was declined. The advertisement was in the Star, in which the plaintiffs did a great deal of advertising. In going by their office on F street, he saw the notice on the board and went in to inquire. His attention was attracted by the price of the offer only, and he went in to inquire what lots they meant and to offer an exchange of improved property. That it was not through plaintiffs their " attention was originally called to lots 10 and 11, and it was not by reason of their advertisement they subsequently became the purchasers." That " we knew, of course, about the corner lot by Mr. M. M. Parker's sign, which was on it long before Daniel & Armat put their sign there."

Witness further said that Barr & Sanner had no intention of buying for cash, for they could not, at that time, have done so. That, after making a loan, they determined to purchase the lots. That they made the purchase through B. H. Warner & Co., who represented them. The price paid was $1.40 per foot, and amounted to $31,000. That becoming the purchasers depended upon two things, one of which was accomplished January 2, 1895. A positive and only offer was made a week before. After negotiating a loan they made the offer. B. H. Warner & Co. arranged the purchase for them.

Louis D. Wine, a member of B. H. Warner & Co., said that Barr & Sanner authorized them to buy the lots for cash as cheap as possible. That he knew they were for sale by both Parker and the plaintiffs. That he saw plaintiffs and made inquiry of them, and saw Parker also. That he made the trade with Parker and the sale was closed through him.

Plaintiffs also testified that Mr. Wine called to see them and was shown a map of the lots. The whole matter was explained to him. He left, saying, " It is a good thing. I will let you hear from me." This was about a week or ten days after the call of Barr & Sanner.

*Mr. Randall Hagner* for the appellants:

It was the duty of the defendant corporation, under all the circumstances proved in the case, and particularly in the light of the letter of its president, sent Mr. Parker and agreed to by plaintiffs, to have enquired of the plaintiffs, and also of Barr & Sanner, to whom the three lots were sold, whether plaintiffs had by their advertisement bulletin board in front of their office, or otherwise, procured Barr & Sanner as the purchasers. *Lloyd* v. *Matthews*, 51 N. Y. 124; *Tyler* v. *Parr*, 52 Mo. 249; *Kilbourn* v. *King*, 6 D. C. Rep. 310; *Bryan* v. *Abert*, 3 D. C. 188.

The rule that if a broker procures a purchaser he is entitled to the commission applies where the property is in the hands of other brokers. *Moses* v. *Bierling*, 31 N. Y. 462. Unless prevented by fraud of principal from making the sale. *Schwartze* v. *Yearly*, 31 Md. 270.

When one party prevents the other from performing the contract he is excused and can recover on a *quantum meruit*. *United States* v. *Peck*, 102 U. S. Rep. 65; *Walker* v. *Yewell*, 101 Mass. 257; *Coleman* v. *Meade*, 13 Bush (Ky.) 358; Fitch on Real Estate Agency, cases in note 3; *Tinges* v. *Moore*, 25 Missouri, 480.

In the following cases it is decided (quoting *Harrod* v.

*Brooke,* 2 Md. 196), that if the broker introduces a purchaser and such introduction is the beginning of the negotiation, he is entitled to commission. *Schwartze* v. *Yearly,* 31 Md. 277; *Kock* v. *Emmerling,* 22 How. 69; *McGavock* v. *Woodlief,* 20 How. 221. If the broker's advertisement introduces the parties and it is the efficient cause of the sale he earns his commission. *Power* v. *Kane,* 5 Wis. 265; *Bell* v. *Cresswell,* 3 Md. 196; Am. & Eng. Ency. L., Vol. 2, p. 385.

*Mr. John Ridout* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

If it be conceded that plaintiff's negotiations with the owner of the third lot (12) and their advertisement in the newspapers and on the blackboard at their office door led up to and were the chief inducing causes of the sale that was afterwards made, still, it does not follow that they thereby became entitled to recover commissions of the defendant.

There is an essential difference in established facts between this case and that of *Bryan* v. *Abert,* 3 App. D. C. 180, which takes it out of the rule therein laid down. There the owner employed or authorized but one agent to sell his land, reserving expressly, that which the law implied, the right to sell it himself to any purchaser not procured by the agent. The agent found the buyer, referred him to the owner for a reduction of price, and was the efficient cause of his buying, although the owner himself made the bargain. He had no other agent, paid no commission to any one else, and sought to retain the same for his own profit. Notwithstanding he claimed that, at the time of closing the sale, he did not know that the agent had found the purchaser and sent him to him, the court thought it unjust that he should take the benefit of the agent's labor and skill without making compensation therefor. And whilst the owner's right to sell his own land to a purchaser found by himself without coming under obli-

gation to the agent by virtue of his employment to sell was fully recognized, it was thought that, under all the circumstances, it was his duty to the agent to inquire whether the purchaser, in that instance, had in fact been found by the agent.

In the case at bar, the defendant, after the arrangement of agency made with the plaintiffs, thought it fair to continue the long standing agency of Mr. Parker.  Remembering the promise made to plaintiffs in respect of their claim to commissions, defendant's president called on them, showed them a letter that he had prepared for transmission to said Parker and obtained their consent to the arrangement therein made for double agency.  It was distinctly agreed, as stated in the letter to Parker, that the commission should be paid as between them respectively, to " whoever sells the property."

By consenting to this new arrangement, no matter what the previous understanding had been, the plaintiffs incurred the risk of competition and the chance of the loss of a commission even after the trouble and expense of advertising had been incurred.

Taking into consideration, as we reasonably should in this new situation, the rights and interest of the agents, respectively, together with the just right of the owner, while acting fairly, to immunity from double liability, the obligation to pay the commission must be confined to the terms in which it was expressed.  As expressed, it was not to pay to one who might, by advertising, find, and, by interviews, stimulate a purchaser; but to the one who should produce him and consummate the sale.  Assuming that plaintiffs found the purchasers, directed their attention to the property, and really induced them to make a final offer to the other agent, nothwithstanding the evidence of one of the purchasers to the effect that they had long known the property and desired to buy it, and had only called on plaintiffs because of their advertisement of a price lower than ever

demanded before, the fact remains, nevertheless, that they did not actually sell the property. The most that can be claimed is that they came very near making the sale and might have done so had the buyers not finally dealt with the rival agent.

Having made this arrangement, it became the duty of the defendant to act impartially between the agents, and not to collude with either, but to pay the commission, as promised, to the one that should produce the buyer and close the sale at its terms.

There is no evidence whatever tending to raise an inference that defendant acted improperly in the transaction, or failed in its duty to the plaintiffs. Whatever injury they may have received, or however unfairly they may have been treated by others, there is no evidence whatever of defendant's collusion in a scheme, if any existed, to prevent them from obtaining the fruits of the sale.

Defendant had promised the commission to either agent who should sell the property. Mr. Parker produced the purchasers and closed the sale, and defendant paid him the commission without notice of any claim thereto on the part of the plaintiffs. Even if it had been informed of plaintiff's claims, before making payment to Parker, there could hardly be a different result; for, as we have seen, the obligation was to the one who actually sold the property, and to no one else. We do not think defendant could have been called on to inquire into and adjudicate the conflicting claims of the agents, founded on the state of facts aforesaid.

It would be unreasonable, and unjust to the owner of property who might, in accordance with what seems to be a common usage, commit its sale to more than one agent, upon the same terms as in this case, to compel him, upon a sale consummated in fact by one, to investigate the respective claims of each agent and to decide between them at his peril. If that was required of him he could have but one agent, else he could not close a single sale in safety. On the other

hand, we think it reasonable and just that the risk of loss should fall upon the agent who enters into an arrangement where, competition being expressly provided for, all of its various chances ought to be considered as assumed.

Suppose that, under such conditions, a buyer's attention is attracted for the first time to a piece of property by the advertisement of one of the agents, followed by interviews and negotiations. No sale is made, but the party subsequently makes up his mind to buy. Then, desiring to favor another agent, and turn the commission to him, he goes to that other and concludes a purchase. Could the owner, when informed of all the facts, defeat the claim of the agent who has in fact made the sale? We do not think that he could.

Whatever may have been the moral obligation of the buyers, or their representatives, in this case, they were under no legal obligation to contract through the plaintiffs. In fact, however, they were not ready to buy at that time, and their desire to acquire the property arose long before they saw the plaintiff's advertisements. Subsequently, when they had made arrangements to borrow money for the purpose, they preferred, for reasons not explained, to make the purchase through the other agent.

It is hard upon plaintiffs to lose the profits they had labored to make in the sale of the property; but that was one of the incidental risks of the competition they had entered into, and affords no reason why the defendant, who had no agency in that loss, should be required to make it good.

Since reaching a conclusion in this case, we have been gratified to find that the same doctrine has been enounced by the Supreme Court of New Jersey in a well considered case wherein the facts are even more favorable to the plaintiff's contention. *Vreeland* v. *Vetterlein*, 33 N. J. L. 247.

Finding no error in the record, we must affirm the judgment, with costs, and it is so ordered.          *Affirmed.*